AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

MAR 16 2017

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| The Premises Known as Virginia Commonwealth Chiropractic 7297 Lee Highway, Suite H, Falls Church, Virginia | ) |

Case No.  1:17-SW-131

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
The Premises Known as Virginia Commonwealth Chiropractic 7297 Lee Highway, Suite H, Falls Church, Virginia, as described in Attachment A.

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | *Offense Description* |
|---|---|---|
| 18 USC § 1347 | Health Care Fraud. | |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

AUSA Ronald Walutes/SAUSA Marina Fernandez

Brandon G. Strait, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  3/16/17

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state:  Alexandria, Virginia

Hon. Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VIRGINIA**

MAR 1 6 2017

IN RE SEARCH OF                                )
The Premises Known as                          )       Case No. 1:17-sw-131
Virginia Commonwealth Chiropractic            )
7297 Lee Highway, Suite H,                     )
Falls Church, Virginia                         )

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Brandon G. Strait, being duly sworn, depose and state:

### BACKGROUND OF AFFIANT

1.      I am employed as a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since January 2006.  I am assigned to a white collar crime squad at the Northern Virginia Resident Agency of the Washington Field Office, in Manassas, Virginia, and have been so assigned since August 2009.

2.      For the purpose of applications for search and arrest warrants, your Affiant is a federal law enforcement officer under applicable provisions of the United States Code and under rule 41(a) of the Federal Rules of Criminal Procedure.

3.      By virtue of my training and experience as a Special Agent assigned to investigate white collar crimes, I am familiar with investigations involving allegations of health care fraud relating to government-sponsored medical insurance programs, such as Medicare, Medicaid and Federal Employee Health Benefit Program, and private insurance companies.

### PURPOSE OF AFFIDAVIT

4.      The Federal Bureau of Investigation ("FBI") is currently conducting an investigation into possible violations of federal criminal laws by individuals associated with Virginia Commonwealth Chiropractic ("VCC").  The FBI has been investigating allegations that

1

Dr. Connie Do, DC (Doctor of Chiropractic) and her husband, Tony Pham, the owners and operators of VCC, are submitting fraudulent health care claims to third party property and casualty insurance carriers in violation of Title 18, United States Code, Section 1347 (Health Care Fraud).

5.      A common scheme to defraud health care benefit programs involves billing for services that were never rendered to patients.  Examples of fraudulent billing for chiropractic services include billing for services which were not performed on a given date of service and/or billing on dates of service in which the patient did not receive treatment.  As a result, billing for services not rendered leads to third party property and casualty insurance carriers paying the provider more money than the provider is entitled to receive.

6.      I submit this affidavit in support of an application for a warrant to search the aforementioned business location of VCC, and the computer systems, data storage devices, and storage media located therein, as more particularly described in Attachment A to this affidavit, and to seize fruits, evidence, contraband, and/or instrumentalities, as more particularly described in Attachment B to this affidavit, for evidence of violations of Title 18 U.S.C. § 1347 (Health Care Fraud).

7.      I base this affidavit upon my personal knowledge, upon information obtained from other law enforcement officers assigned to this investigation, and upon information obtained from cooperating third party property and casualty insurance carriers, including: Allstate, Ameriprise, AssuranceAmerica, National General, Travelers, Geico, and Alfa Vision.

8.      This affidavit does not include all the evidence developed during the course of the investigation.  Instead, I have set forth sufficient information to establish probable cause for the issuance of the requested search warrant.

2

## APPLICABLE CRIMINAL STATUTE

9.     Title 18, United States Code, Section 1347 (Health Care Fraud), makes it an offense for any person knowingly and willfully to execute, or attempt to execute, a scheme or artifice to defraud any health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody of, any health care benefit program.

## CHIROPRACTIC SERVICES

10.     Chiropractic is a form of conservative treatment commonly used to treat musculoskeletal ailments, such as: low back pain, neck pain, headaches, sport-related injuries and injuries sustained after motor vehicle accidents.  Chiropractic services generally consist of spinal manipulations used in conjunction with common physical therapy modalities, including: exercise, massage/manual techniques, electric stimulation, ultrasound, and ice/heat modalities. Treatment plans, including length of treatment and employed treatment modalities, are generally dictated by the doctor of chiropractic ("DC") after performing an initial examination and assessing the patient's level of injury.

11.     Chiropractic services are commonly reimbursed by third party health benefit programs.  In general, chiropractors obtain reimbursement for chiropractic services by submitting a claim to the patient's insurance carrier. These claims may either be sent via wire, known as electronic claims, or through the United States mail, known as paper claims.  These claims are imaged (electronic claim) or printed (paper claim) onto a CMS 1500 form and typically contains the patient's name, date of birth, insurance company member number, service rendered (CPT code - "Common Procedural Terminology"), diagnosis code (ICD-9 code - "International Classification of Disease"), chiropractor's name and associated service charge.

3

When the claim is approved, a check for the service is sent to the insured or the chiropractor, usually along with an Explanation of Benefits (EOB) which identifies how the claim was paid, and if applicable, the patient's responsibility (i.e. deductible, copay, etc.).

### PERSONAL INJURY

12. Chiropractors commonly treat patients for injuries sustained to soft tissues as the result of motor vehicle accidents. In these cases, third party property and casualty insurance carriers act as health benefit programs by paying claims associated with bodily injury. Depending on the patient's property and casualty insurance coverage, chiropractors may submit claims contemporaneously to the patient's insurance company (Medpay), may submit an itemized bill to the patient's attorney (if applicable) after the patient has been discharged from treatment, or a combination of submitting claims to the patient's Medpay policy and submitting an itemized bill to the patient's attorney.

13. It is common for victims involved in motor vehicle accidents to retain an attorney to assist in settling an accident claim with a property and casualty insurance carrier. In general, personal injury attorneys use the medical bills as a bench mark to determine an appropriate settlement amount. It is the affiant's understanding that personal injury attorneys will generally try to settle a case at three times the cost of the medical bills. For example, if the medical bill (or chiropractic bill) is $4,000, the attorney will attempt to settle the bodily injury claim for approximately $12,000. By doing so, the attorney will pay the medical bills, at $4,000, pay the patient/client, at $4,000, and pay attorney fees, at $4,000. In cases of personal injury fraud, there is a presumption for the chiropractor to inflate the medical bills in order to inflate the attorney's potential settlement. In doing so, the attorney, chiropractor and patient/client will be paid at a higher rate than they may be entitled to receive.

4

## VIRGINIA COMMONWEALTH CHIROPRACTIC

14.     VCC is a limited liability corporation in the Commonwealth of Virginia, located

at 7297 Lee Highway, Suite H, Falls Church, Virginia.  VCC is owned and operated by Connie

Do, DC ("DO"), and her husband, Tony Pham ("PHAM").  According to the Virginia

Department of Health Professions' ("VDHP") records, DO is a chiropractor and her Virginia

medical license number, 0104556124, is current and scheduled to expire on September 30, 2018.

According to VDHP's records, PHAM is not a licensed medical provider in the Commonwealth

of Virginia.  According to DC Department of Health Licensee Details, PHAM was licensed in

Naturopathy, license number NAT1000398, which expired on 02/28/2010.  It is the affiant's

understanding that VCC caters mostly to personal injury clients in the Falls Church Asian

community.

## INVESTIGATION

Complainant:

15.     On February 1, 2016, a witness with close associations to the business of VCC,

herein referred to as "Complainant," alleged that DO and PHAM were engaging in a healthcare

fraud scheme involving personal injury patients.  According to Complainant, accident victims

were being referred to DO for treatment of possible injuries sustained as a result of their

accidents.  DO fraudulently inflated the bills in two ways:  (1) billing for services provided by

PHAM, an unlicensed individual, as if DO had provided the services, and (2) billing for services

on dates that the patient was not seen.

16.     Complainant stated that DO works at a chiropractic office located in Maryland,

Monday through Friday, in the morning hours.  The complainant stated that DO does not arrive

at VCC until 3:00 pm.  Prior to DO's arrival at VCC, PHAM treats motor vehicle accident

clients at VCC and bills the services as if DO had performed the treatments.

17.    Complainant conveyed that within the patient file is a ledger, or sheet of paper,

which is used to track the number of appointments the patient has had at VCC. The left column

of the ledger is intended to document the date in which treatment was rendered. The right

column is intended to document the patient's signature or acknowledgement that treatment was

rendered on the documented date. Complainant stated that on the initial office visit, DO has the

patient sign their name (on the right side of the ledger) on multiple lines without corresponding

dates. This practice allows DO to later fill in false dates of service and still have a legitimate

patient signature next to the false dates. According to conversations the Complainant had with

former patients, patients were seen at VCC for 3 to 5 visits, but their insurance companies were

billed for 18 to 20 office visits at VCC.

Interview AB:

18.    On October 17, 2016, "AB" was interviewed by affiant. AB stated that he was

involved in an automobile accident on October 16, 2014. After the accident, AB received

chiropractic treatment from DO. On the first or second chiropractic visit, DO introduced AB to

an affiliate of Attorney 1, with the understanding that Attorney 1 would assist AB with settling

his accident claim. AB showed affiant a copy of the bill he requested from DO after not

receiving a settlement check from Attorney 1. The bill articulated 14 office visits with a total

cost of $3,710 for services rendered by DO.

19.    On January 23, 2017, affiant received AB's claim package from Ameriprise Auto

and Home Insurance. The claim package includes a demand package sent from Attorney 1,

which contains a medical bill from DO, progress notes for each date billed, and initial/final

reports. A review of the demand package revealed medical bills from DO in the amount of $6,085 entailing progress notes for 25 office visits.

20.     Based on the aforementioned, affiant believes that DO attempted to defraud Ameriprise approximately $2,375 by submitting a bill for services not rendered.

Interview AB2:

21.     On October 21, 2016, "AB2" was interviewed by affiant. AB2 stated that she was involved in an automobile accident on December 17, 2013. After the accident, AB2 went to the hospital on two occasions. While at the hospital, an unknown individual gave her DO's business card. On AB2's first appointment, DO told AB2 that she could help her get an attorney to file a claim. DO introduced AB2 to an affiliate of Attorney 1, with the understanding that Attorney 1 would assist AB2 settle her accident claim. After the meeting, AB2 recalled DO asked her to sign her name multiple times on a ledger to indicate that she had received more treatments than she had actually received. AB2 believed she continued with chiropractic treatments for approximately 5 office visits.

22.     On January 18, 2017, affiant received the AB2's claim package from Travelers Insurance. The claim package included a demand package sent from Attorney 1 which contains a medical bill from DO, progress notes for each date billed, and initial/final reports. A review of the demand package revealed medical bills from DO in the amount of $5,070 entailing progress notes for 21 office visits.

23.     Based on the aforementioned, affiant believes that DO attempted to defraud Travelers by submitting a fraudulent bill representing services not rendered. By dividing the billed amount ($5,070) by the number of treatments (21 visits), DO was charging approximately

7

$241.42 per office visit.  AB2 believed she had attended five office visits.  Affiant believes that AB2's bill from DO should have been billed at approximately $1,207.10.  Affiant believes that DO attempted to defraud Travelers approximately $3,862.90.

Interview KP:

24.     On November 1, 2016, "KP" was interviewed by affiant.  KP stated that she was involved in an automobile accident on January 8, 2014.  After the accident, KP attended chiropractic treatment from DO.  KP recalled DO telling her that she would set her up with an attorney to assist with settling her claim.  KP believed DO sent her information to Attorney 1, but stated that she never met Attorney 1.  KP recalled being treated by DO on two occasions before stopping treatment.

25.     On February 13, 2017, affiant received KP's claim package from Allstate.  The claim package included a demand package sent from Attorney 1, which contains a medical bill from DO, progress notes for each date billed, and initial/final reports.  A review of the demand package revealed medical bills from DO in the amount of $4,505 entailing progress notes for 18 office visits.

26.     Based on the aforementioned, affiant believes that DO attempted to defraud Allstate by submitting a fraudulent bill representing services not rendered.  By dividing the billed amount ($4,505) by the number of treatments (18 visits), DO was charging approximately $250.28 per office visit.  KP believed she had attended two office visits.  Affiant believes that KP's bill from DO should have been billed at approximately $500.56.  Affiant believes that DO attempted to defraud Allstate approximately $4,004.44.

Interviews of CC, PC and LN:

8

27.   On October 17, 2016, "CC" was interviewed by affiant. "PC" is the minor son of CC. CC stated that she was involved in an automobile accident with PC and "LN" on May 3, 2014. After the accident, based on LN's recommendation, CC and PC attended a chiropractic treatment from DO. CC did not like DO's office, thinking it was dirty, and did not return for follow-up treatments. CC never met with an attorney.

28.   On October 13, 2016, LN was interviewed by affiant. LN stated that he was involved in an automobile accident with CC and PC on May 3, 2014. LN's ex-girlfriend recommended that he meet with an affiliate of Attorney 1 to assist in filing an automobile accident claim. LN believed he signed the appropriate representation paperwork and sent it to Attorney 1 via facsimile or email, however, LN had never met Attorney 1. LN followed up with chiropractic treatments at DO's office for approximately three visits prior to discontinuing.

29.   On February 8, 2017, affiant received a claim package for CC, PC and LN from AssuranceAmerica Insurance. The claim package included a demand package sent from Attorney 1 which contained medical bills from DO, progress notes for each date billed, and initial/final reports for CC, PC, and LN. A review of the demand package revealed medical bills from DO in the amount of $5,995, encompassing 25 office visits for CC, medical bills from DO in the amount of $4,985, encompassing 20 office visits for PC, and medical bills from DO in the amount of 6,085, encompassing 25 office visits for LN.

30.   Based on the aforementioned, affiant believes that DO attempted to defraud AssuranceAmerica by submitting fraudulent bills representing services not rendered. Regarding CC, by dividing the billed amount ($5,995) by the number of treatments (25 visits), DO was charging approximately $239.80 per office visit. CC believed she had attended one office visit.

9

Affiant believes that CC's bill from DO should have been billed at approximately $239.80.

Affiant believes that DO attempted to defraud AssuranceAmerica approximately $5,755.20 for

CC's claim. Regarding PC, by dividing the billed amount ($4,985) by the number of treatments

(20 visits), DO was charging approximately $249.25 per office visit. CC believed PC had

attended one office visit. Affiant believes that PC's bill from DO should have been billed at

approximately $249.25. Affiant believes that DO attempted to defraud AssuranceAmerica

approximately $4,735.75 for PC's claim. Regarding LN, by dividing the billed amount ($6,085)

by the number of treatments (25 visits), DO was charging approximately $243.40 per office visit.

LN believed he had attended three office visits. Affiant believes that LN's bill from DO should

have been billed at approximately $730.20. Affiant believes that DO attempted to defraud

AssuranceAmerica approximately $5,354.80 for LN's claim.

31.     In total, affiant believes DO attempted to defraud AssuranceAmerica

approximately $15,845.75.

Interview MT:

32.     On June 8, 2016, "MT" was interviewed by affiant. MT stated that she was

involved in an automobile accident on January 9, 2013. After the accident, MT attended

chiropractic treatment with DO. On the second chiropractic visit, DO introduced MT to an

affiliate of Attorney 1, with the understanding that Attorney 1 would assist MT settle her

accident claim. MT recalled being seen two times per week and stated that her appointments

were routinely in the morning hours. She believed that 50% of her chiropractic visits involved

treatment performed exclusively by PHAM, as DO was not present at the office to perform the

services.

10

33. On January 26, 2017, affiant received MT's claim package from Allstate. The claim package included a demand package sent from Attorney 1, which contained medical bills from DO, progress notes for each date billed, and initial/final reports. A review of the demand package revealed medical bills from DO in the amount of $4,660 entailing progress notes for 19 office visits.

34. Based on the aforementioned, affiant believes that DO attempted to defraud Allstate by submitting fraudulent bills whereby DO represented that the services that were provided to MT were performed by a licensed provider (DO) despite being performed by an unlicensed provider (PHAM). In furtherance, the progress notes for all 19 office visits are written in the same handwriting, which affiant believes to be DO's handwriting. Affiant believes this was done in order to conceal DO and PHAM's criminal activity. MT believed that 50% of her treatments were performed by PHAM. Affiant believes that DO attempted to defraud Allstate approximately $2,330.

Interview of TL:

35. On November 2, 2016, "TL" was interviewed by affiant. TL stated that he was involved in an automobile accident on January 30, 2014. After the accident, a friend recommended that TL go to DO for treatment. On the first chiropractic visit, DO introduced TL to an affiliate of Attorney 1, with the understanding that Attorney 1 would assist TL settle his accident claim. TL stated that he attended his chiropractic treatments and scheduled appointments in both the mornings and afternoons depending on his work schedule. TL stated that he was often times seen by an older man because DO was not at the office. It is affiant's belief that the older man is PHAM.

11

36.     On January 24, 2017, affiant received TL's claim package from Geico Indemnity Company. The claim package included a demand package sent from Attorney 1, which contained medical bills from DO, progress notes for each date billed, and initial/final reports. A review of the demand package revealed medical bills from DO in the amount of $6,005 entailing progress notes for 25 office visits.

37.     Based on the aforementioned, affiant believes that DO attempted to defraud Geico by submitting fraudulent bills representing services that were provided by an unlicensed provider yet billed as if a licensed provider performed the services. In furtherance, the progress notes for all 25 office visits are written in the same handwriting, which affiant believes to be the handwriting of DO. Affiant believes this was done in order to conceal DO and PHAM's criminal activity. An actual loss amount to Geico has not yet been determined.

Interview LS:

38.     On November 3, 2016, "LS" was interviewed by affiant. LS stated that she was involved in an automobile accident in December 2013. After the accident, LS was referred the office of DO by an acquaintance. On the initial chiropractic visit, DO introduced LS to an affiliate of Attorney 1, with the understanding that Attorney 1 would assist LS settle her accident claim. LS continued with her chiropractic services and stated that the majority of her treatments took place in the morning and recalled being seen the majority of the time by PHAM.

39.     On February 6, 2017, and February 14, 2017, affiant received LS's claim packages from Alfa Vision Insurance Corporation and Allstate, respectively. The claim package included a demand package sent from Attorney 1, which contained medical bills from DO,

progress notes for each date billed, and initial/final reports. A review of the demand package revealed medical bills from DO in the amount of $5,870 entailing progress notes for 24 office visits.

40. Based on the aforementioned, affiant believes that DO attempted to defraud Alfa Vision and Allstate by submitting fraudulent bills representing services that were provided by an unlicensed provider yet billed as if a licensed provider performed the services. In furtherance, the progress notes for all 24 office visits are written in the same handwriting, which affiant believes to be the handwriting of DO. Affiant believes this was done in order to conceal DO and PHAM's criminal activity. An actual loss amount to Alfa Vision and Allstate has not yet been determined.

Travel Records and Maternity:

41. Investigation to date revealed that DO, using United States passport number 448838300, and PHAM, using United States passport number 449065661, made three extended trips outside of the continental United States. Reviewed records revealed the following trips: Florida to Mexico leaving on January 15, 2012 and returning January 22, 2012; Newark to China leaving February 26, 2014 and returning March 19, 2014; and Florida to the Bahamas leaving January 12, 2015 and returning January 17, 2015. It is affiant's belief that DO would not be able to provide services or bill for services if she was not in the United States.

42. According to open source reporting, DO had a child born at Inova Fairfax Hospital on November 20, 2012. It is affiant's belief that claims submitted and paid by third party property and casualty insurance carriers surrounding the date of November 20, 2012 would be highly suspicious of fraud.

43.     Affiant received claims data from State Farm Insurance and Geico for the relevant travel time periods and dates surrounding the delivery of DO's son.  During the relevant time period, DO billed Geico for the treatments of five individual claimants, for a total of $2,160. During the relevant time period, DO billed State Farm for the treatments of five individual claimants, for a total of $2,305.  The claims included charges for the following manual chiropractic/physical therapy procedures:  (1) Traction (CPT 97012 - $35.00), (2) Interferential (CPT 97014 - $35.00), (3) Ultrasound (CPT 97035 - $35.00), (4) CMT Manipulate - $50.00), (5) Therapeutic Exercise (CPT 97110 - $45.00), (6) Myofascial Release (CPT 97140-59 - $45.00), (7) Muscle Re-Ed Laser (CPT 97110 - $45.00), and (8) Vibratory Massage (CPT 97016 - $35.00).  For the ten patients in question, DO billed a total of 108 individual CPT codes for an aggregated total to Geico and State Farm of $4,465.  Further review of the records revealed that DO wrote and signed the progress notes for the billed dates in question.  It is affiant's belief that DO wrote the progress notes to avoid suspicion and conceal her criminal activity.

## CONCLUSION

44.     Based on the information obtained during the investigation and my training and experience, I submit that probable cause exists to believe that DO is engaging in a pervasive health care fraud scheme designed to obtain higher reimbursements from third party property and casualty insurance carriers by submitting claims for services that were either not rendered or rendered by an unlicensed individual but billed as if DO performed the treatment.

45.     Based upon my experience, education, and knowledge of this case, evidence of the alleged fraud would likely be reflected in the following types of records:  patient files, appointment books, and other medical and financial records and documents, computer hardware

14

and software and computer associated data relating to medical billing, and the medical, financial and accounting operations of DO. Such records would likely be maintained manually and/or with the use of computer hardware and software equipment such as disks, magnetic tapes, programs, and computer generated printouts.

46.     The patient, financial, and business records described above are likely at the offices of VCC, 7297 Lee Highway, Suite H, Falls Church, Virginia. A medical provider typically maintains these types of records in order to provide support for patient medications and billing transactions if later questioned by insurers, vendors, the Internal Revenue Service, and federal or state regulatory agencies. Furthermore, doctors are required to retain many of these records pursuant to state or federal law.

47.     Based upon my experience as a Special Agent, it is necessary to conduct a detailed review of the books and records, as described above, of DO's office in their entirety to determine the accounting of the billing in question as described in the affidavit.

**Computer and Other Electronic Evidence**

48.     During my career as a Special Agent, I have consulted with computer experts in the execution of federal search warrants involving computers, including their seizure and subsequent forensic examination of evidence. Based on my training and experience, I am aware that the types of records described in this affidavit are often maintained in both hard copy and electronic media formats, such as computers and personal digital assistants. Based on my knowledge, training, and experience and consultation with other federal law enforcement officers, I am aware that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important

15

respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).

49.     Based on my training, experience, and consultation with other federal law enforcement officers, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or otherwise controlled environment. This is true because of the following:

a.     The volume of evidence

Computer storage devices (like hard drives, diskettes, tapes, laser disks, cd's) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all stored data to determine which particular files are evidence of a crime. This sorting process can take days or weeks, depending on the volume of data stored, and it may be impractical to attempt this kind of data search on site.

b.     Technical requirements

Searching computers for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search

16

protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction, a controlled environment is essential to its complete and accurate analysis.

50.     Upon securing the computer so that no information contained therein can be changed, altered, damaged or corrupted, our Computer Assistance Response Team (CART) will attempt to create an electronic image of those parts of the computer that are likely to store evidence of documents and information described in this affidavit. In order to determine whether the computer contains any information within the scope of the warrant, it will be necessary to examine the programs and file names saved in the computer's memory, much the way file folders would be reviewed during the execution of a search warrant to determine if the files are within the scope of the search warrant.

51.     Affiant is aware that VCC continues to provide patient care. Therefore, the FBI CART team will attempt to image the computers on-site. After inspecting the computer systems, however, our computer analysts may determine it is not feasible to electronically image the necessary data on site, due to any of the circumstances described above, and the computer systems and related peripherals may have to be seized and removed from the premises, so that the data can be retrieved and preserved in a laboratory or other controlled environment. If, after inspecting the computer systems, the analyst(s) determines that these items are no longer necessary to retrieve and preserve the data evidence, the government will return them within a reasonable time.

17

52. Any of the items described above may be stored in the form of magnetic or electronic coding on computer media or media capable of being read by a computer with the aid of computer-related equipment, including floppy diskettes, fixed hard disks and drives, or removable hard disk cartridges. The search procedure of the electronic data contained in computer operating software or memory devices, whether performed on site or in a laboratory, or other controlled environment, may include the following techniques:

a. Surveying various file "directories" and the individual files they contain (which is analogous to looking at the outside of a file cabinet for the markings it contains, and opening a drawer believed to contain pertinent files.)

b. "Opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c. "Scanning" storage areas to discover and possibly recover recently deleted data;

d. Scanning storage areas for deliberately hidden data or files; and

e. Performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

53. Based on the foregoing, I believe there is probable cause to believe that the premises known as VCC, 7297 Lee Highway, Suite H, Falls Church, Virginia, will contain the items set forth in Attachment B, which constitute evidence, contraband, and/or instrumentalities of the violations of 18 U.S.C. § 1347 (health care fraud). As such, I respectfully request that a

search warrant be issued for the premises known as Virginia Commonwealth Chiropractic, 7297

Lee Highway, Suite H, Falls Church, Virginia.


Brandon G. Strait,
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me
the 16th day of March, 2017

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

Theresa C. Buchanan
United States Magistrate Judge

## ATTACHMENT A

## PREMISES TO BE SEARCHED

The premise to be searched is the business address of Dr. Connie Do, DC, Virginia Commonwealth Chiropractic, 7297 Lee Highway, Suite H, Falls Church, Virginia. The office is located in a strip of commercial townhouses, located on the east side of the intersection of Lee Highway and Graham Road. The office is more specifically described as Suite H, a brick, townhouse unit located roughly in the middle of the townhouse complex. The red entry door clearly identifies the suite by a set of gold numbers denoting "7297" and a gold letter "H." A sign which hangs on the building's facade clearly reads, "Virginia Commonwealth Chiropractic, Dr. Connie Do, (703) 533-1201."

## ATTACHMENT B

## ITEMS TO BE SEIZED

Evidence of Medical Insurance fraud in violation of Title 18, United States Code, Section 1347 (Health Care Fraud) including:

1.      All corporate, proprietor, and partnership documents pertaining to the formation of such entities, including those records pertaining to Virginia Commonwealth Chiropractic, such as financial statements, corporate minutes, certificate of incorporation documents;

2.      All records and documentation concerning policy holders of the above-named businesses, including all patient medical files related to the above businesses, including claim forms, charts, x-rays, histories, billing statements, appointment logs, office sign-in sheets, transportation logs, patient assessments, evaluations, patient referral forms, prescription files, payment receipts, insurance records, correspondence, patient progress notes, inter-office memoranda, facsimile messages, insurance/identification cards of policy holders and telephone messages in any form.

3.      All records related to the above-named businesses, including but not limited to seller applications, insurance policy contracts, loan applications, correspondence, financial statements, policy holder files, billing information, payroll and personnel records, selling materials and presentations.

4.      Any cellular telephone, and all documents relating thereto, including billing statements, subscriber information, and call detail records.

5.      All records reflecting revenue and income and expenditures of Virginia Commonwealth Chiropractic, Connie Do, and Tony Pham including but not limited to: bank accounts, retirement funds, 401Ks, credit lines, including but not limited to bank statements,

deposit slips, registers, check books, checks, check stubs, money orders, and wire transfer notices, income tax returns, W-2 forms, 1099 forms, K-1 form, schedule, and related tax information;

6.     All records referring or relating to the location of any cash or funds, including any safety deposit box or key;

7.     Addresses and/or telephone books, Rolodex indices and any papers of software reflecting names, addresses, telephone numbers, pager numbers, facsimile and/or telephone numbers of financial institutions, any other individuals, businesses or entities with whom a financial or business relationship exists.

8.     All calendars, appointment books and other papers or electronic records that reflect appointments with and/or names, addresses and/or telephone numbers of health care professionals and other entities doing business with the above-named businesses

9.     All computer and electronic equipment, storage media, and devices which are capable of analyzing, creating, displaying, converting, storing or transmitting electronic computer impulses or data, that may relate in any way to the items set forth in this attachment, including electronic data processing and storage devices, computers and computer systems, including central processing units and circuit boards, attached or unattached to the computer, all internal and peripheral storage devices, systems documentation, operating logs, related documentation, software, and instructions manuals.

10.     Receipts from the United States Postal Service and/or next day carrier services documenting the intra/interstate sending and receiving of documents, checks or mailings.

11.     Personnel and payroll records, to include employment contracts and agreements.

12.     Documents related to any complaints or inquiries into the practices of the above-

22

named businesses by policy holders, their family members, anonymous sources, regulatory agencies, law enforcement agencies, or any other sources.

13.    Records related to the receipt of payments for medical services performed on policy holders, including accounting records, books of original entry, general ledgers, cash receipt journals, expense journals, and bank statements.

14.    Business records to include ledgers, journals, registers, invoices and receipts. The terms "records," "documents," and "materials" include all of the foregoing items of evidence in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created or stored, including but not limited to, any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); or any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, photocopies): any electrical, electronic, or magnetic form) such as tape recordings, cassettes, compact disks, or any information on an electric or magnetic storage device, such as floppy diskettes, hard drives, CD-ROMs, optical disks, printer buffers, smart cards, memory calculators, electrical dialers, Bernoulli drives, or electronic notebooks, as well as printouts or readouts from any magnetic storage device.